## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

JEFFREY LEE COOPER
a/k/a JEFFREY L. COOPER
a/k/a JEFFREY COOPER
d/b/a SHILO MARKET
a/k/a JEFF COOPER

Case No.  09-30751

Debtor


TENNESSEE EDUCATION
LOTTERY CORPORATION

Plaintiff

v.                                                        Adv. Proc. No.  09-3062

JEFFREY LEE COOPER

Defendant


## M E M O R A N D U M


**APPEARANCES**:    ROBERT E. COOPER, JR.
                    TENNESSEE ATTORNEY GENERAL AND REPORTER
                     William F. McCormick, Esq.
                     Post Office Box 20207
                     Nashville, Tennessee  37202-0207
                     Attorneys for Plaintiff

                    DOUGLAS L. PAYNE, ESQ.
                     401 West Irish Street
                     Greeneville, Tennessee  37743
                     Attorney for Defendant


**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint of the Tennessee Education Lottery Corporation to Determine Dischargeability of Debt Under 11 U.S.C. § 523(a)(2) (Complaint) filed by the Plaintiff, Tennessee Education Lottery Corporation, on May 20, 2009, seeking a judgment in the amount of $5,104.00 and a determination that the judgment is nondischargeable under 11 U.S.C. § 523(a)(4) (2006).[1]  The Defendant filed his Answer to Complaint of the Tennessee Education Lottery Corporation to Determine Dischargeability of Debt Under 11 U.S.C. § 523(a)(2) (Answer) on June 12, 2009.  A scheduling conference was held on July 23, 2009.  Pursuant to the pretrial Order entered on July 27, 2009, the parties stipulated that the Defendant is indebted to the Plaintiff in the amount of $5,104.00 and that the indebtedness arises out of the Defendant's failure to remit lottery ticket sale proceeds to the Plaintiff, leaving only the issue of dischargeability in dispute.  The parties additionally agreed that all matters in controversy could be resolved on stipulations and briefs and that an evidentiary hearing is not required.

The facts and documents necessary for the resolution of this adversary proceeding are before the court through the Complaint and an attached exhibit, a Retailer Contract executed by the parties on September 14, 2007, the Answer, and the Parties Joint Stipulation of Facts (Joint Stipulations) filed on September 18, 2009, containing three stipulated exhibits:  (1)  a Retailer Application executed by the Defendant on September 14, 2007; (2)  an accounting of proceeds received and due from Shilo Market dated February 25, 2009; and (3)  a sample lottery invoice.  As directed by the July 27, 2009 pretrial Order, the Plaintiff filed the Plaintiff's Brief in Support of Complaint (Plaintiff's Brief) on October 9, 2009, and the Defendant filed the Defendant's Brief in Support of

---

[1] The Complaint's title erroneously references § 523(a)(2).  All citations and allegations within the body of the Complaint, as well as the request for relief, are grounded on § 523(a)(4).

2

Answer on October 29, 2009.  Additionally, the court, pursuant to Rule 201 of the Federal Rules of Evidence, takes judicial notice of documents of record in the Defendant's underlying bankruptcy case and the Plaintiff's Policy Manual, Chapter 2 - Retailer Rules and Regulations (Retailer Rules and Regulations) referenced in paragraph 1. of the Retailer Contract and accessible at http://www.tnlottery.com/retailers/media/Retailer_Rules_Regulations_110209.pdf.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(I) (2006).

# I

On September 14, 2007, the Defendant, as sole proprietor of Shilo Market located at 700 Jearoldstown Road, Greeneville, Tennessee, executed a Retailer Application with the Plaintiff consisting of five separate parts.  JT. STIPS. at ¶ 6; STIP. COLL. EX. 1.  In "Part 1 - Business Information," the Defendant provided the Plaintiff with information concerning his business of Shilo Market.  STIP. COLL. EX. 1.  In "Part 5 -  Retailer Servicing," he provided store hours, average customer count, and employee information.  STIP. COLL. EX. 1.  In "Part 2 - Personal Information (Owner)," the Defendant provided the Plaintiff with personal information, including his birth date, social security number, home address, and tax payment history, and in "Part 3 - Criminal Background Check," he again provided personal information and authorized the Plaintiff to conduct a criminal background check in association with the application process.  STIP. COLL. EX. 1.  Both Parts 1 and 2 were notarized and provided the Plaintiff with a general authorization for the release of information.  STIP. COLL. EX. 1.  Finally, "Part 4 - Lottery Retailer Electronic Funds Transfer

3

Authorization," which has an effective date of October 29, 2007, required the Defendant to provide

bank information in accordance with the following:

> INSTRUCTIONS:  The Retailer must establish a separate electronic funds transfer ("EFT") bank account for the preservation and transfer of lottery funds.  The separate bank account must be specified "IN TRUST FOR THE TENNESSEE EDUCATION LOTTERY CORPORATION."  The Retailer's depository institution must confirm the establishment of the Tennessee Education Lottery Corporation Trust Account by signing in the space below.

> 2.    RETAILER AUTHORIZATION:  I (we) hereby authorize the Tennessee Education Lottery Corporation to initiate debit and credit entries in any available and appropriate account to my (our) account indicated below and authorize the depository named below to debit or credit the same to such account.  I (we) hereby further authorize and direct the depository institution named below to release any information regarding such account, including, but not limited to, account balance information, payment history, and overdraft information to the Tennessee Education Lottery Corporation upon request by an authorized representative of the Tennessee Education Lottery Corporation.  My (our) authorization is given in accordance with subsection (e)(2) of Section 502 of the "Gramm-Leach-Bliley Act of 1999" (15 U.S.C.A. § 6802) and shall remain in effect until expressly revoked by me (us) in writing.  Any such revocation shall be deemed to have been properly given if sent by hand delivery, or by overnight courier, to such depository institution at the address set forth below.  Such revocation shall be deemed to have been delivered on the date of delivery if by hand delivery or if by overnight courier, on the next business day following the deposit of such communication with the overnight courier.

STIP. COLL. EX. 1.  Additionally, Part 4 contains a "Depository Institution Acknowledgment" signed

by Andrew Johnson Bank acknowledging that the Defendant had established an account "IN TRUST

FOR THE TENNESSEE EDUCATION LOTTERY CORPORATION" together with a voided check

evidencing Andrew Johnson Bank's routing number and the Defendant's account number.  STIP.

COLL. EX. 1.

4

Also on September 14, 2007, the Defendant entered into a Retailer Contract with the Plaintiff

for the authorized sale of lottery tickets.  JT. STIPS. at ¶ 1; COMPL. EX. 1.  As material to the issues

before the court, the Retailer Contract provides as follows:

> THIS RETAILER CONTRACT is between TENNESSEE EDUCATION LOTTERY
> CORPORATION ("TEL"), a public corporation created pursuant to the Tennessee
> Education Lottery Implementation Law (the "Act"), and the undersigned Retailer.
> Capitalized terms used herein shall have the meanings set forth in Appendix A to the
> TEL's Retailer Rules and Regulations ("Retailer Rules"), unless otherwise defined
> in context.  Retailer and the TEL hereby agree as follows:
>
> 1. Retailer Rules.  Retailer agrees to comply with and to be bound by the Act, each
> of the TEL's Rules and Regulations (the "TEL Rules and Regulations"), and all other
> applicable laws, rules, regulations, ordinances and orders (collectively, the
> "Governing Law").  Retailer agrees at all times  to meet the minimum qualification
> for a TEL Retailer as set forth in the Governing Law, and to notify the TEL of any
> changes in its business, as specified in the Act and the Retailer Rules.  On or before
> the commencement of the sale of lottery Tickets by Retailer, the TEL will make
> available to Retailer the Retailer Rules; furthermore, a copy of the Retailer Rules is
> available to Retailer on the TEL's website or the TEL's retailer website.
> Furthermore, the Retailer Rules may be amended from time to time, in the sole
> discretion of the TEL, and the Retailer Rules, as and when amended, shall be
> effective as against Retailer upon the approval of the revised Retailer Rules by the
> TEL's Board of Directors.
>
> 2. Term.  The term of this Retailer Contract shall begin as of the date it is executed
> by Retailer, as shown below, and shall remain in effect until terminated by either
> party as provided for herein, in the Retailer Rules or in the Act.  In the event that the
> TEL and Retailer have entered into any Retailer Contract(s) dated prior to the date
> of this Retailer Contract, the TEL and Retailer agree that from the beginning of the
> term hereof, this Retailer Contract shall supersede and replace any prior contract
> between Retailer and the TEL in its entirety for each Retailer Business Location
> listed below or in Schedule I attached hereto and incorporated herein by reference.
>
> 3. Contract Termination.  This Retailer Contract may be canceled by Retailer upon
> twenty (20) calendar day's [sic] prior written notice to TEL.  The TEL may cancel,
> deny, revoke, or terminate this Retailer Contract for any of the reasons set forth in
> Exhibit A, attached hereto and incorporated herein by reference.  In addition, if the
> chief executive officer of the TEL (the "CEO") determines, in such officer's sole
> discretion, that cancellation, denial, revocation, suspension, or termination of this
> Retailer Contract is in the best interest of the TEL, the State of Tennessee or the

5

public welfare, the CEO may cancel, deny, revoke, suspend or terminate this Retailer Contract upon written notice to Retailer; provided, however, Retailer shall be entitled to a hearing on such cancellation, denial, revocation, suspension or termination in accordance with the Act and the TEL Rules and Regulations; provided, further, that the CEO may temporarily suspend Retailer's rights under this Retailer Contract without prior notice (written or otherwise), pending any prosecution, hearing or investigation, in accordance with the Act.

4.  Ticket Sales.  Retailer agrees to sell lottery Tickets for all the games it is authorized by the TEL to sell, and only at the Retailer Business Locations listed below for which the TEL has issued a Certificate of Authority or such temporary locations as authorized by the TEL.  Retailer agrees that it shall sell no other lottery Tickets in the State of Tennessee, except those provided to it for sale by the TEL. Retailer agrees that it shall adopt safeguards to assure that it will not sell lottery Tickets or pay prizes to persons under the age of 18 years.  Retailer agrees that it shall sell lottery Tickets only at the prices, and only subject to the terms and conditions, as determined by the TEL unless prior written authorization is received from the CEO in each instance.  In accordance with the amounts specified in the Act and the TEL Rules and Regulations, as full and complete compensation under this Retailer Contract, the TEL will pay Retailer Commissions and other compensation for lottery Tickets sold and for winning lottery Tickets paid by Retailer.

5.  Electronic Funds Transfer.  Retailer shall have a fiduciary duty to preserve and to account to the TEL for all proceeds from the sale of lottery Tickets collected by it and shall be responsible for and liable to the TEL for all such proceeds.  All proceeds from the sale of lottery Tickets and all other funds due the TEL shall constitute a trust fund in favor of the TEL until paid to the TEL.  Subject to the Act and the TEL Rules and Regulations, Retailer agrees:  (i) to maintain for the purpose of this Retailer Contract a separate bank demand account in the name of the Retailer as "Trustee for the Tennessee Education Lottery Corporation", with a bank, acceptable to TEL, which is a member of an automated clearing house association (ACH); (ii) to deposit daily into that bank account all proceeds from the sale of lottery Tickets and other funds due the TEL; (iii) to authorize the TEL to initiate Electronic Funds Transfer ("EFT") to and from that account for the net settlement amount due to the TEL from the sales of TEL lottery Tickets; and (iv) that sufficient funds shall be available in the designated account on the dates specified by the TEL to cover the amounts due the TEL, as determined by TEL.  Retailer shall be liable for the cost of the TEL's legal fees, including but not limited to court costs, filing fees and lawyer's fees, in connection with any legal action brought by the TEL to recover past due amounts from Retailer.

6.  Prize Payments.  During its normal business hours, Retailer agrees to immediately validate all lottery Tickets, to pay cash prizes up to and including $599, and to sell

6

all lottery games that it is authorized by the TEL to sell.  Such payment for winning Tickets shall not be in amounts greater or less than the amounts authorized by TEL, and shall never be subject to restrictions or conditions other than those imposed by TEL.  If it becomes permissible under the Act to compensate retailers for paying cash lottery prizes, the TEL may, but is not obligated to, pay to Retailer a cash bonus (or other remuneration as permitted by law) for cashing lottery prizes.

7.  <u>Promoting Sales</u>.  Retailer agrees to prominently display, in locations accessible to the public, point-of-sale advertising and other public information material and supplies provided from time to time by the TEL and its Vendors and suppliers. Retailer agrees that one or more of its employees shall attend all training sessions, as requested from time to time by the TEL.  In order to assist Retailer with sales of lottery Tickets, the TEL and its Vendors and suppliers may provide certain equipment (such as Lottery Terminals, Ticket dispensers, satellite dishes, play stations, etc.) to be held in the custody and control of Retailer without any transfer of ownership of such equipment to Retailer.  Retailer agrees to return any such equipment and supplies upon request of the owner or upon termination or suspension of this Retailer Contract and agrees to be financially liable and responsible for the use, preservation and protection of such equipment and supplies, normal wear and tear excepted.

8.  <u>Acceptance and Return of Instant Tickets</u>.  Subject to the conditions and reposting requirements more fully set forth in the TEL Rules and Regulations:  (i)  Retailer shall have a fiduciary duty and responsibility to preserve and to account for all Instant Tickets accepted from the TEL or its distributor, as well as cash proceeds from the sale of any lottery proceeds; (ii)  any Instant Ticket not properly accounted for by the Retailer upon termination of the Retailer Contract, upon demand by the TEL, or at the End of Game date for the corresponding Instant Game, regardless of the reason, shall be deemed to have been purchased by the Retailer; (iii)  Retailer shall be responsible for the full price of Instant Tickets, less any applicable Commissions, for all Instant Tickets which may be lost, stolen, or damaged after deliver to Retailer; and (iv)  the TEL will accept full and partial Instant Ticket Pack returns within (3) weeks of the termination, cancellation, suspension, revocation or non-renewal of this Retailer Contract.  Retailer shall be financially responsible for any Instant Ticket Packs it is unable to locate or account.  The TEL may reduce Retailer's cost for non-activated Instant Ticket Packs, provided that Retailer complies with the reporting requirements in accordance with the Retailer Rules, and provided, further, that no Instant Tickets in the Instant Ticket Pack have been presented for validation or otherwise activated.

. . . .

7

12. <u>Contract Changes</u>.  This Retailer Contract, including the Act and the TEL Rules and Regulations, is the entire contract between the TEL and Retailer.  This Retailer Contract may not be modified or amended except by a writing signed by both parties hereto or by amendment to the Act or the TEL's Rules and Regulations.  Any changes, revisions. or amendments to this Retailer Contract made by Retailer prior to its submission to the TEL shall cause this Retailer Contract to become null and void.  To the extent of any conflict, the provisions of the Act shall govern the TEL's Rules and Regulations, and the TEL's Rules and Regulations shall govern the Retailer Contract.

COMPL. EX. 1.  Pursuant to the Retailer Contract and the Retailer Application, the Defendant was authorized to sell lottery tickets, deposit proceeds from the sale of tickets into a separate bank account in the Defendant's name as "Trustee for the Tennessee Education Lottery Corporation," advertise himself as a lottery retailer, and receive commissions from sales and cash payouts.  Neither document granted the Defendant the authority to represent or bind the State of Tennessee other than as a retailer of lottery tickets, nor to invest lottery proceeds, to make discretionary distributions from lottery proceeds, or to delegate his duties to anyone without the Plaintiff's approval as set forth in the Retailer Application.  JT. STIPS. at ¶ 7; STIP. COLL. EX. 1; COMPL. EX. 1.

As required by the Retailer Application and Retailer Contract, the Defendant opened an account with Andrew Johnson Bank for the deposit of lottery ticket sale proceeds, authorizing the Plaintiff to transfer funds to and from the account via electronic funds transfer. JT. STIPS. at ¶ 3. The Plaintiff then delivered packets of lottery tickets to the Defendant's business for sale to the public. JT. STIPS. at ¶ 4; STIP. COLL. EX. 1; COMPL. EX. 1.  Thereafter, the Defendant failed to make the required deposits of lottery ticket sale proceeds, and, as of November 29, 2008, he had failed to preserve, account for, and deliver lottery ticket sale proceeds to the Plaintiff in the aggregate amount of $5,104.00.  JT. STIPS. at ¶ 2; STIP. COLL. EX. 2.

8

The Defendant filed the Voluntary Petition commencing his case under Chapter 7 on February 17, 2009, and the Plaintiff timely filed the Complaint initiating this adversary proceeding on May 20, 2009.  As previously discussed, the sole issue is whether the $5,104.00 owed by the Defendant to the Plaintiff is nondischargeable.

## II

The determination of dischargeability is governed by 11 U.S.C. § 523, which, as material to this adversary proceeding, provides that "[a] discharge under section 727, . . . of this title does not discharge an individual debtor from any debt— . . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"  11 U.S.C. § 523(a).  Courts construe § 523(a) strictly against the party seeking nondischargeability and liberally in favor of debtors, with the party seeking nondischargeability bearing the burden of proof as to each element by a preponderance of the evidence.  *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991); *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

The Plaintiff seeks a determination of nondischargeability under the defalcation while acting in a fiduciary capacity prong of § 523(a)(4).[2]  Defalcation "encompasses not only embezzlement and

---

[2]  In addition to defalcation while in a fiduciary capacity, § 523(a)(4) also includes embezzlement, defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come[,]" *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996), and larceny, defined as "[t]he unlawful taking and carrying away of property of another with intent to appropriate it to use inconsistent with latter's rights[,]" BLACK'S LAW DICTIONARY 881 (6th ed. 1990), when a debtor wrongfully and with fraudulent intent takes property from its rightful owner. *Great Am. Ins. Co. v. O'Brien (In re O'Brien)*, 154 B.R. 480, 483 (Bankr. W.D. Tenn. 1993) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991)).  Embezzlement differs from larceny because the embezzler's initial acquisition of the property at issue is lawful. *Aristocrat Lakewood Nursing Home v. Dryja (In re Dryja)*, 259 B.R. 629, 632 (Bankr. N.D. Ohio 2001).

9

misappropriation by a fiduciary, but also the 'failure to properly account for such funds.'" *Bd. of Trs. of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 639 (6th Cir. 2007) (quoting *Capitol Indem. Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121, 125 (6th Cir. 1985)); *see also Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511-12 (2d Cir. 1937) ("[W]hen a fiduciary takes money upon a conditional authority which may be revoked and knows at the time it may, he is guilty of a 'defalcation' though it may not be 'fraud,' or an 'embezzlement,' or perhaps not even a 'misappropriation.'").

"This standard does not require a showing that the debtor acted intentionally[;]" *Sangal v. Strickfaden (In re Strickfaden)*, 421 B.R. 802, 807 (Bankr. E.D. Mich. 2009), nevertheless, "defalcation per se" does not exist. "[I]nstead the debtor must have been objectively reckless in failing to properly account for or allocate funds[,]" *Patel v. Shamrock Floorcovering Svcs., Inc. (In re Patel)*, 565 F.3d 963, 970 (6th Cir. 2009), since "[t]he mere failure to meet an obligation while acting in a fiduciary capacity simply does not rise to the level of defalcation[.]" *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 180 (6th Cir. 1997). In order to sustain a determination of nondischargeability under this subsection, the Plaintiff must prove "(1) a pre-existing fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss." *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005) (citing *Garver*, 116 F.3d at 180).

Whether a relationship falls within the scope of § 523(a)(4) is a question of "federal, not state, law." *Blaszak*, 397 F.3d at 390. The Sixth Circuit interprets "fiduciary capacity" narrowly, not intending for it to extend its inclusion to a party "who merely fails to meet an obligation under

10

a common law fiduciary relationship[,]" *Bucci*, 493 F.3d at 639, but limiting its application "to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Garver*, 116 F.3d at 180. Moreover, "for a trust relationship to satisfy § 523(a)(4), the alleged fiduciary must have duties that preexist the act creating the debt." *Bucci*, 493 F.3d at 643. In support of its averments that its relationship with the Defendant meets the Sixth Circuit's definition of "fiduciary" and the $5,104.00 in lottery ticket sale proceeds not remitted to it by the Defendant falls within the purview of § 523(a)(4), the Plaintiff relies upon the Retailer Contract and Retailer Application executed by the Defendant in conjunction with the following statute to show the existence of either an express or technical trust:

**4-51-120. Lottery retailers -- Fiduciary duty -- Protection against loss.**

(a) All proceeds from the sale of the lottery tickets or shares shall constitute a trust fund until paid to the corporation either directly or through the corporation's authorized collection representative. A lottery retailer and officers of a lottery retailer's business shall have a fiduciary duty to preserve and account for lottery proceeds and lottery retailers shall be personally liable for all proceeds. Proceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds of the sale of any lottery products, net of allowable sales commissions and credit for lottery prizes sold to or paid to winners by lottery retailers. Sales proceeds and unused instant tickets shall be delivered to the corporation or its authorized collection representative upon demand.

(b)(1) Pursuant to § 4-51-105(a)(3), the corporation shall adopt and enforce policies designed to safeguard and limit the opportunity for loss of lottery proceeds that are not in the possession of the corporation. Such policies may include, but are not limited to:

(A) Requirements governing financial institutions into which retailers shall deposit lottery proceeds;

(B) Requirements for the establishment of separate accounts for the deposit of lottery proceeds by retailers;

(C) The timing of deposit of lottery proceeds by retailers; and

     (D) The timing of withdrawal of funds from retailer accounts by the corporation.

    (2) Any policies designed to safeguard and limit the opportunity for loss of lottery proceeds, and any revisions to such policies, shall be filed with the state funding board.

(c) Notwithstanding any provision of law to the contrary, whenever any person who receives proceeds from the sale of lottery tickets or shares in the capacity of a lottery retailer becomes insolvent or dies insolvent, the proceeds due the corporation from such person or that person's estate shall have preference over all debts or demands.

TENN. CODE ANN. § 4-51-120 (2005).[3] "All lottery proceeds shall be the property of the corporation [the Plaintiff,]" TENN. CODE ANN. § 4-51-111(a)(1) (Supp. 2009), and all lottery proceeds are to be deposited into a "lottery for education account," inclusive of a general shortfall reserve subaccount and a special reserve subaccount, with all unclaimed prize moneys to be deposited into the "after school programs special account." TENN. CODE ANN. § 4-51-111(b), (f) (Supp. 2009).

While this is a case of first impression in the Sixth Circuit and Tennessee, there is a split of authority among other courts addressing the issue of whether unpaid lottery ticket sale proceeds fall within the scope of § 523(a)(4) and are thus nondischargeable. *Compare, e.g., Ga. Lottery Corp. v. Thompson (In re Thompson)*, 296 B.R. 563 (Bankr. M.D. Ga. 2003), *N.J. v. Kaczynski (In re Kaczynski)*, 188 B.R. 770 (Bankr. D.N.J. 1995), and *R.I. Lottery Comm'n v. Cairone (In re Cairone)*, 12 B.R. 60 (Bankr. D.R.I. 1981) (holding that the debts were nondischargeable), *with Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339 (5th Cir. 1998), *Ill. Dep't of Lottery v. Marchiando (In*

---

[3] With respect to lottery retailers, "[t]he general assembly recognizes that to conduct a successful lottery, the corporation must develop and maintain a state-wide network of lottery retailers that will serve the public convenience and promote the sale of tickets or shares and the playing of lottery games while ensuring the integrity of the lottery operations, games, and activities." TENN. CODE ANN. § 4-51-115(a) (Supp. 2009).

*re Marchiando)*, 13 F.3d 1111 (7th Cir. 1994), *N.C. Lottery Comm'n v. Wells (In re Wells)*, 2009

Bankr. LEXIS 4293, 2009 WL 5667709 (Bankr. E.D.N.C. Dec. 23, 2009), and *In re Schesterman*,

108 B.R. 893 (Bankr. D. Conn. 1989) (holding that the debts were dischargeable).  Of these

decisions, the majority of courts have focused upon the wording of the individual state statutes and

the duties imposed on the respective debtors in conjunction with each circuit's application of

§ 523(a)(4), although one focused solely upon the contracts entered into between the parties.[4]

   In support of his position, the Defendant cites almost exclusively to the *Tran* case, arguing

that the Fifth Circuit's reliance upon the Seventh Circuit's interpretation of a true fiduciary

relationship – i.e., one involving a difference in knowledge and power between the fiduciary and the

beneficiary in which "the former assumes 'a position of ascendency over the latter'" – should

likewise be followed in this case and that the Defendant was "merely an agent of the State of

Tennessee."  DEF.'S BRIEF at 4-5.  *Tran* involved facts similar to those presently before the court,

in which the Texas Lottery Commission sought a determination that unpaid lottery ticket sale funds

---

   [4] In the *Wells* case, the court agreed that § 523(a)(4) required a narrow interpretation of fiduciary relationship as well as the existence of an express or technical trust; however, based upon the contract entered into between the debtor and the North Carolina Lottery Commission, which did not require that retailers establish a named trust bank account or other designation that it was a trust account for the benefit of the North Carolina Lottery Commission, it found that the contract created neither an express nor a technical trust and that the debtor was not, therefore, operating in a fiduciary capacity.  *Wells*, 2009 Bankr. LEXIS 4293, at *6-7, 2009 WL 5667709, at *2.  The *Wells* decision does not make any reference to the North Carolina State Lottery Act (N.C. GEN. STAT. § 18C-101 et seq.), and it is unknown from the decision if the North Carolina Lottery Commission relied upon the statute.  Nevertheless, the court notes that North Carolina's statute, which varies a great deal from Tennessee's, was amended effective July 27, 2009, to add the following provision to § 18C-143 outlining the responsibilities of retailers:  "(f) All lottery proceeds minus applicable retailer commissions are held in trust by lottery retailers until such time as they are received by the Commission.  A lottery retailer shall have a fiduciary duty to preserve and account for lottery proceeds including any unsold tickets."  N.C. GEN. STAT. § 18C-143(f) (2009).  The contract in *Wells* in 2006, prior to the filing of the debtor's bankruptcy case in 2008, was not governed by the foregoing provision.  Additionally, the court noted that the retailer contract in North Carolina had been revised as of May 8, 2008, providing for the establishment of a separate bank account to hold funds in trust and not commingled with other funds, an amendment that the court viewed as "significant."  *Wells*, 2009 Bankr. LEXIS 4293, at *17, 2009 WL 5667709, at *6.

were nondischargeable under § 523(a)(4), arguing that the debtors were fiduciaries under the Texas

lottery statute which provided, *inter alia*, that all money and unsold lottery tickets were to be held

in trust for the benefit of the state[5] and imposed specific bookkeeping requirements for agents but

did not require them to maintain a separate bank account or segregate funds. *Tran*, 151 F.3d at 341.

Affirming the bankruptcy court's determination that the Texas Lottery Act did not make its ticket

sales agents fiduciaries, the Fifth Circuit first stated that while statutory trusts can fall within the

purview of § 523(a)(4),

> [i]t is not enough, however, that a statute purports to create a trust:  A state cannot
> magically transform ordinary agents, contractors, or sellers into fiduciaries by the
> simple incantation of the term "trust" or "fiduciary."   Rather, to meet the
> requirements of § 523(a)(4), a statutory trust must (1) include a definable res and (2)
> impose "trust-like" duties.

*Tran*, 151 F.3d at 342-43.

Although it agreed with the Texas Lottery Commission that a trust was created under the

Texas statute, the court found that the statute was insufficient to impose "'trust-like' duties" which

satisfied § 523(a)(4), despite the inclusion of language in the administrative rules that "[a]ll proceeds

---

[5] § 466.353.  Liability of Sales Agent

(a)  A sales agent is liable to the division for all tickets accepted or generated by the sales agent or any
employee or agent, and tickets shall be deemed to have been purchased by the sales agent unless
returned to the division within the time and manner prescribed by the division.

(b)  Money received by a sales agent from the sale of tickets, less the amount retained for prizes paid
by the sales agent or for the agent's commission, if any, together with any unsold tickets, shall be held
in trust for the benefit of the state before delivery to a lottery operator or the division or electronic
transfer to the state treasury, and the sales agent is liable to the division for the full amount of the
money or unsold tickets so held.  If the sales agent is not an individual, each officer, director, or owner
of the sales agent is personally liable to the division for the full amount of the money or unsold tickets
held in trust for the benefit of the state.

TEX. GOV'T CODE § 466.353 (Supp. 1998).

from the sale of lottery tickets received by a retailer shall constitute a trust fund until paid to the Texas Lottery . . . [and a] retailer shall have a fiduciary duty to preserve and account for lottery proceeds." *Tran*, 151 F.3d at 343 (quoting 16 TEX. ADMIN. CODE TIT. § 401.351). In explanation, the court stated that the Texas statute did not contain a duty that the trustee of funds refrain from spending trust funds for non-trust purposes, nor did it mandate the segregation of lottery proceeds. *Tran*, 151 F.3d at 344. Finally, the court discussed the *Marchiando* decision, agreeing that "a true fiduciary relationship involves a difference in knowledge and power between the fiduciary and beneficiary, in which the former assumes 'a position of ascendancy over the latter,'" summarizing that the Texas lottery statute

> not only fails to impose the core duties to which we have looked in the past as indicators of a true fiduciary relationship – an express prohibition on spending trust funds for non-trust purposes and an express requirement to segregate such funds – but, more fundamentally, fails to entrust the ticket sales agent with the state's money for safekeeping or otherwise to grant him a "position of ascendency" over the state. In short, although the state as principal, sought by the simple expediency of a change in labels to transform its relationship with Tran, as its agent, it failed to effect a change in the substance of that relationship.

*Tran*, 151 F.3d at 345.

The *Marchiando* case, relied upon by the *Tran* court, affirmed the decisions of the bankruptcy and district courts in those actions brought by the Illinois Department of Lottery and likewise involved unpaid lottery ticket sale proceeds. However, unlike the Texas statute, the Illinois statute expressly stated that all lottery ticket sale proceeds and unsold tickets "'shall constitute a trust fund until paid to the Department,' . . . forbids the commingling of these proceeds with other funds, and makes the violation of its provisions a felony." *Marchiando*, 13 F.3d at 1113 (quoting 20 ILL.

Comp. Stat. § 1605/10.3[6]).  Nevertheless, the bankruptcy court, making the following assessment,

held that neither an express trust nor a fiduciary relationship was created by the Illinois lottery

statute:

> Technically, Marchiando became a trustee as soon as she received her license to sell
> lottery tickets.  Realistically, the trust did not begin until she failed to remit ticket
> receipts.  For until then she had no duties of a fiduciary character toward the
> Department of Lottery or anything or anyone else.  Until then, she was just a ticket
> agent.  The state, afraid that she might be a disloyal agent, required her to keep the
> proceeds of her ticket sales separate from her other funds and threatened her with
> criminal punishment if she did not.  These were devices by which the state sought to
> establish and enforce a lien in the proceeds, the better to collect them securely.
>
> . . . .
>
> If we probe more deeply the distinction between the fiduciary relation that imposes
> real duties in advance of the breach and the fiduciary relation that does not we find
> that the first group of cases involve a difference in knowledge or power between
> fiduciary and principal, which . . . gives the former a position of ascendency over the
> latter.
>
> . . . .

---

[6] § 20 ILCS 1605/10.3. [Proceeds as trust fund]

Sec. 10.3.  All proceeds from the sale of lottery tickets or shares received by a person in the capacity
of a sales agent shall constitute a trust fund until paid to the Department either directly, or through the
Department's authorized collection representative.  Proceeds shall include unsold instant tickets
received by a sales agent and cash proceeds of sale of any lottery products, net of allowable sales
commissions and credit for lottery prizes paid to winners by sales agents.  Sales proceeds and unsold
instant tickets shall be delivered to the Department or its authorized collection representative upon
demand.  Sales agents shall be personally liable for all proceeds which shall be kept separate and apart
from all other funds and assets and shall not be commingled with any other funds or assets. In the case
of a sales agent who is not an individual, personal liability shall attach to the owners and officers of
the sales agent.  The Department shall have a right to file a lien upon all real and personal property
of any person who is personally liable under this Section for any unpaid proceeds, which were to be
segregated as a trust fund under this Section, at any time after such payment was to have been made.
Such lien shall include any interest and penalty provided for by this Act and shall be deemed
equivalent to, and have the same effect as, the State tax lien under the Retailers' Occupation Tax Act
[35 ILCS 120/1 et seq.]. The term "person" as used in this Section, and in Section 10.4 of this Act [20
ILCS 1605/10.4], shall have the same meaning as provided in Section 10 of this Act [20 ILCS
1605/10].  This Section, and Sections 10.4 and 10.5 of this Act [20 ILCS 1605/10.4 and 20 ILCS
1605/10.5] shall apply with respect to all lottery tickets or shares generated by computer terminal,
other electronic device, and any other tickets delivered to sales agents on and after September 1, 1987.

> These are all situations in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals.

*Marchiando*, 13 F.3d at 1116.  Citing to cases from the Seventh, Fifth, and Second Circuits, the court further stated that those cases

> have involved either express trusts of a conventional variety or fiduciary relations of the kind just described – relations of inequality that justify the imposition on the fiduciary of a special duty, basically to treat his principal's affairs with all the solicitude that he would accord to his own affairs.  Nothing of the sort is involved here.  The fiduciary is a ticket agent with no edge based on the possession of power or expertise; the principal is the state itself.  The inequality of relation that calls for the imposition of fiduciary duties is wholly absent.

*Marchiando*, 13 F.3d at 1116.

The Defendant urges the court to follow the decisions of the Fifth and Seventh Circuits in *Tran* and *Marchiando* and find that there was no fiduciary relationship between himself and the Plaintiff and that no express or technical trust was created.  However, after careful analysis of the record as a whole, considering not only the language of the Tennessee Education Lottery Implementation Law, but also the language of the Retailer Application, Retailer Contract, and the Retailer Rules and Regulations and the requirements set forth within those documents, the court finds that, under Sixth Circuit authority and applicable Tennessee law, an express trust was created, a fiduciary relationship existed between the parties, the Defendant breached his fiduciary duty to the Plaintiff, and the $5,104.00 in unpaid lottery proceeds owed to the Plaintiff is nondischargeable under § 523(a)(4).

Although the question of "whether an express or technical trust exists is governed by state law," *Baker v. Wentland (In re Wentland)*, 410 B.R. 585, 597 (Bankr. N.D. Ohio 2009), the Sixth Circuit has held that a creditor must demonstrate the following to establish the existence of an express or technical trust in a § 523(a)(4) action:  "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." *Blaszak*, 397 F.3d at 391-92 (citation omitted).  These requirements correspond with the necessary elements for proof of an express trust in Tennessee: "(1) a trustee who holds trust property and who is subject to the equitable duties to deal with it for the benefit of another; (2) a beneficiary to whom the trustee owes the equitable duties to deal with the trust property for his benefit; and (3) identifiable trust property." *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 849-50 (6ᵗʰ Cir. 2002) (quoting *Kopsombut-Myint Buddhist Ctr. v. State Bd. of Equalization*, 728 S.W.2d 327, 333 (Tenn. Ct. App. 1986) (citations omitted)).  Additionally, "it is clear in this circuit that a statute may create a trust for purposes of § 523(a)(4) if that statute defines the trust res, imposes duties on the trustee, and those duties exist prior to any act of wrongdoing." *Bucci*, 493 F.3d at 640; *see also Shafer Redi-Mix, Inc. v. Craft*, 414 B.R. 165, 171 (W.D. Mich. 2009).

Express trusts are created "by the direct and positive acts of the parties, by some writing, deed, or will . . . or by the action of a court in the exercise of its authority . . .[.]" *Jackson v. Dobbs*, 290 S.W. 402, 404 (Tenn. 1926) (quoting *Lafferty v. Turkey*, 35 Tenn. 157, 163 (1855)). Nevertheless, "the applicable state law creating a fiduciary relationship must clearly outline the fiduciary duties and identify the trust property" and if it does not "clearly and expressly impose trust-like obligations on a party, the court should not assume that such duties exist and should not find that

18

there was a fiduciary relationship." *Crowe v. Moran (In re Moran)*, 413 B.R. 168, 186 (Bankr. D. Del. 2009); *accord Tran*, 151 F.3d at 342-43. "As a general rule, a separation of legal title and equitable ownership of the trust property is necessary to the formation of an express trust[,]" *Volunteer State Oil Co. v. Adkisson (In re Adkisson)*, 26 B.R. 882, 882 (Bankr. E.D. Tenn. 1983), and "[w]here a person has or accepts possession of personal property with the express or implied understanding that he is not to hold it as his own absolute property, but to hold it and apply it for certain specific purposes or for the benefit of certain specified persons, a valid and enforceable express trust exists." *Cannon*, 277 F.3d at 850 (quoting *In re Elrod*, 42 B.R. 468, 473 (Bankr. E.D. Tenn. 1984)).

"At a minimum, there must be a grantor or settlor who intends to create a trust; a corpus (the subject property); a trustee; and a beneficiary. The trustee holds legal title and in that sense, owns the property, holding it for the benefit of the beneficiary who owns the equitable title. While the grantor may retain either of these interests, no one may solely hold both as the purpose of separating the two would be defeated." *Myers v. Myers*, 891 S.W.2d 216, 218 (Tenn. Ct. App. 1994). Similarly, technical trusts are defined as "'obligation[s] arising out of a confidence reposed in a person to whom the legal title of property is conveyed, that he will faithfully apply the property according to the wishes of the creator of the trust[,]'" *Knox County v. Fourth & First Nat'l Bank*, 182 S.W.2d 980, 984 (Tenn. 1944) (quoting *Jackson v. Dobbs*, 290 S.W. 402, 405 (Tenn. 1926)), and "are created by an agreement between the parties to impose a trust relationship . . . [but] may also

be created by a statute that specifically imposes fiduciary obligations on a party." *Smallwood v. Howell (In re Howell)*, 178 B.R. 730, 732 (Bankr. W.D. Tenn. 1995).[7]

Unquestionably, the facts of *Tran* and *Marchiando* are nearly identical to those in this case; however, the statutes and associated regulations, not to mention the law upon which those decisions were based, are significantly different. Similar to the Tennessee statute, both the Texas and Illinois statutes speak of a sales agent's liability for unsold tickets and provide that the money received for sold tickets, as well as unsold tickets, are to be held in trust for the state's benefit. Unlike Tennessee's and Illinois's statutes, the Texas statute can be differentiated because it does not require the maintenance of a separate bank account for lottery ticket sale proceeds or any sort of segregation of funds, nor does it prohibit lottery agents from spending lottery ticket sale funds on items unrelated to the lottery, two delinquencies expressly identified by the *Tran* court as indicative of the lack of a fiduciary relationship, undercutting the state's arguments to the contrary. *Tran*, 151 F.3d at 344-45.

Notwithstanding the fact that it did not find a fiduciary relationship, the *Tran* court did state that the Texas statute "adequately sets forth the putative trust res," *Tran*, 151 F.3d at 343, while the *Marchiando* court found that the Illinois statute created a trust akin to one "that has no existence before the wrong is committed." *Marchiando*, 13 F.3d at 1115. Nevertheless, both courts agreed that there was no fiduciary relationship granted by either of the statutes in question because the

---

[7] "Notwithstanding the differences in the means of establishing these two types of trusts, the scope of technical and express trusts is 'not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law.'" *N.J. v. Kaczynski (In re Kaczynski)*, 188 B.R. 770, 774 (Bankr. D.N.J. 1995) (quoting *Windsor v. Librandi (In re Librandi)*, 183 B.R. 379, 382 (M.D. Pa. 1995)).

statutes did not place the respective debtors into "a 'position of ascendency' over the state," without

which, the state failed to "transform its relationship with Tran, as its agent," *Tran*, 151 F.3d at 345,

and from which "is wholly absent" from the Illinois statute. *Marchiando*, 13 F.3d at 1116.[8]  The

Sixth Circuit, however, has no such requirement, as evidenced by its precedential authority

interpreting defalcation by a fiduciary under § 523(a)(4).

Although not concerning lottery proceeds, in *Blaszak*, the court examined whether the debtor,

who was the sole owner, shareholder, attorney, and officer of Consumers Land Title Agency, Inc.,

which had entered into an agency agreement with the plaintiff, Commonwealth Land Title Company,

to be an issuing agent for the plaintiff, committed defalcation while acting in a fiduciary capacity for

purposes of § 523(a)(4) when he failed to remit to the plaintiff money collected from settlements and

closings and premiums he had collected on the plaintiff's behalf.  In affirming the decisions of both

the bankruptcy court and the bankruptcy appellate panel that the debt was nondischargeable under

§ 523(a)(4), the Sixth Circuit made the following finding:

> All four elements of a technical or express trust clearly exist here, as demonstrated
> by the terms of the agency agreement between Consumers and Commonwealth.  The
> agency agreement demonstrates the pre-incorporation intent to create a trust:  The
> term of the agreement provided that (1) the funds being held by Consumers on behalf
> of Commonwealth were to be segregated from other funds; (2) remitted on a regular
> basis to Commonwealth; (3) Blaszak was to serve as trustee; (4) the moneys collected
> by Consumers on behalf of Commonwealth were to provide the trust res; and (5)
> Commonwealth was the named beneficiary.

*Blaszak*, 397 F.3d at 392.

---

[8] The court takes note of the dissent filed by Judge Garza to the *Tran* decision in which he set forth several examples through which the Texas statute and administrative rules imposed sufficient trust-like duties and found the majority's reliance upon *Marchiando* "misplaced" and "inconsistent with" Fifth Circuit law.  *Tran*, 151 F.3d at 346.

Similarly, the court found the existence of a trust and the requisite fiduciary relationship stemming from the Michigan Builders Trust Fund Act in *Patel*, reaffirming the Circuit's earlier decision in *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249 (6th Cir. 1982), that the statutory language "the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor shall be considered . . . to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors, or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him . . .[,]" sufficiently imposed upon contractors the duty to pay the subcontractors and other beneficiaries before any other expenses, arising at the time any monies were paid, whether there were actual beneficiaries to the trust at that point or not. *Patel*, 565 F.3d at 969 (quoting MICH. COMP. LAWS § 570.151); *see also Huizinga v. United States*, 68 F.3d 139, 144 (6th Cir. 1995) (holding that the statute "imposes a 'trust' upon the building contract fund" and "[t]he trust relationship is unambiguously imposed" by the statutory language). The court additionally reaffirmed the determination that defalcation occurs when the evidence supports a finding that a debtor has been "objectively reckless in failing to properly account for or allocate funds" by using "'monies paid into the building contract fund . . . for purposes other than to pay laborers, subcontractors or materialmen first [and] is sufficient to constitute a defalcation under [§] 523(a)(4) so long as the use was not the result of mere negligence or a mistake of fact.'" *Patel*, 565 F.3d at 970 (quoting *Johnson*, 691 F.2d at 257); *but cf. Bucci*, 493 F.3d at 643 (finding that the contractual obligation to pay the employer contributions to an ERISA plan did not create an express or technical trust or evidence a trust relationship with duties existing prior to the act creating the debt).

22

The Sixth Circuit's interpretation and application of § 523(a)(4) falls in line with that of the Bankruptcy Court for the Middle District of Georgia in *Thompson*,[9] the Bankruptcy Court for the District of New Jersey in *Kaczynski,* and the Bankruptcy Court for the District of Rhode Island in *Cairone*.  In each of these cases, the respective statutes, regulations, and contracts – like those in question here – required the creation of separate bank accounts, provided that the defendant retailers had a fiduciary duty to preserve and account for all proceeds, and provided that all proceeds and unsold tickets constituted a trust fund in favor of the plaintiffs, who were the owners of the proceeds and unsold tickets.  *See Thompson*, 296 B.R. at 566 ("The Retailer Contract and The Georgia Lottery for Education Act require that lottery proceeds be kept separate from other funds.  Lottery proceeds are trust funds which are property of the Georgia Lottery Corporation.  The lottery retailer and its officers have a fiduciary duty to preserve and account for lottery proceeds."); *Kaczynski*, 188 B.R. at 776 ("[Upon receipt of tickets], the agent is obligated to account for either the tickets or proceeds received from the sale of the tickets.  In addition, the agent is obligated to maintain and provide current reports and records with respect to lottery transactions and operations and deposit sale proceeds in a separate account.  These duties were not imposed at the time the debtors failed to remit the ticket receipts.  Rather, they were imposed at the time the debtors received the tickets from the Commission."); *Cairone*, 12 B.R. at 62 ("R.I. Gen. Laws § 42-61-6 in straightforward, no-frills language specifically prescribes that the funds received from the sale of lottery tickets be held as a

---

[9] The reasoning in *Thompson* is based upon the Eleventh Circuit's decision in *Quaif v. Johnson*, 4 F.3d 950 (11th Cir. 1993), holding that a Georgia statute requiring insurance agents to remit premiums collected on behalf of insurers created a technical trust such that the failure to remit payments constituted defalcation while acting in a fiduciary capacity under § 523(a)(4).  The bankruptcy courts for the Northern Division of Georgia have likewise, under the directives of *Quaif*, determined that failure to remit lottery proceeds constitutes defalcation under § 523(a)(4).  *See Ga. Lottery Corp. v. Daniel*, 225 B.R. 249 (Bankr. N.D. Ga. 1998); *see also Ga. Lottery Corp. v. Sadler (In re Sadler)*, 2007 Bankr. LEXIS 745, 2007 WL 625915 (Bankr. M.D. Ala. Feb. 26, 2007) (applying Georgia and Eleventh Circuit law).

'trust fund' by the agent until he [she] remits them to the Lottery Commission.  The statute imposes trust-like duties on the agent in handling the funds, requiring the proceeds be segregated from all other monies and holding the sales agent personally liable for all collected proceeds.  Under the statute, the trust commences when the lottery ticket purchaser advances money to the agent for a lottery ticket, and therefore, it is clear that the trust arises prior to, rather than by virtue of, any defalcation.").

Based upon the foregoing, the court finds that an express trust was created between the Plaintiff and the Defendant by virtue of Tennessee Code Annotated § 4-51-120, the Retailer Contract, the Retailer Application, and the Retailer Rules and Regulations.  First, the statute defines the identifiable trust res:  all proceeds from the sale of lottery tickets or shares, including unsold instant tickets in the retailer's possession and cash proceeds of the sale of any lottery product, less allowable sales commissions and cash prizes awarded to purchasers, which, pursuant to Tennessee Code Annotated § 4-51-111(a)(1), are property of the Plaintiff and which "shall constitute a trust fund until paid to the corporation either directly or through the corporation's authorized collection representative."  TENN. CODE ANN. § 4-51-120(a).  Similarly, the Retailer Contract expressly identifies as the trust fund res "all Instant Tickets accepted from the TEL or its distributor, as well as cash proceeds from the sale of any lottery products," COMPL. EX. 1. at ¶ 8, and states that "[a]ll proceeds from the sale of lottery Tickets and all other funds due the TEL shall constitute a trust fund in favor of the TEL until paid to the TEL."  COMPL. EX. 1. at ¶ 5.  Finally, the Retailer Rules and Regulations likewise state that all proceeds from the sale of tickets and other funds due the TEL "shall constitute a trust fund in favor of the TEL until paid to the TEL, and such proceeds are

24

required by law to be deposited daily into the . . . separate bank account no later than the close of the next banking day after the date of their collection by the Retailer." RETAILER RULES AND REGULATIONS at ¶ 2.12.A.

The Retailer Contract additionally establishes the Defendant as trustee and the Plaintiff as beneficiary, setting forth the following duties by the Defendant:  (1) requiring the creation and maintenance of a separate bank account in his business's name "as Trustee for the Tennessee Education Lottery Corporation;" (2) requiring the Defendant to make daily deposits of all lottery sales proceeds into the separate bank account; (3) requiring the Defendant to authorize the Plaintiff access to the separate account through electronic funds transfer; and (4) ensuring that the account funds are in the account for access by the Plaintiff, all of which are reiterated in the Retailer Rules and Regulations and are authorized by Tennessee Code Annotated § 4-51-120(b)(1).  COMPL. EX. 1. at ¶ 5; RETAILER RULES AND REGULATIONS at ¶ 2.12.A.  These duties are also set forth in Part 4 of the Retailer Application, which required the Defendant to establish a separate bank account "for the preservation and transfer of lottery funds" to which the Plaintiff had access through electronic funds transfer and stated that the account "must be specified 'IN TRUST FOR THE TENNESSEE EDUCATION LOTTERY CORPORATION,'" with Andrew Johnson Bank required to certify and acknowledge that the Defendant had, in fact, established the account in the manner directed by the Retailer Contract.  COLL. STIP. EX. 1.  Furthermore, in the event of the Defendant's death or insolvency, the Plaintiff enjoys "preference over all debts or demands" as to any proceeds from the sale of lottery tickets.  TENN. CODE ANN. § 4-51-120(c).

Under the Retailer Contract, the Defendant had the power to sell lottery tickets, deposit proceeds from the sale of tickets, advertise himself as a lottery retailer, and receive commissions on the sale of lottery tickets and cash payouts.  He was not authorized to invest lottery proceeds or otherwise make discretionary distributions from funds that constituted lottery proceeds, and he was not authorized to delegate his duties without the express authority of the Plaintiff.  Additionally, as required under the terms of the Retailer Contract, the stipulated Retailer Application, and section 2.12 of the Retailer Rules and Regulations, the Defendant established a bank account with Andrew Johnson Bank "IN TRUST FOR THE TENNESSEE EDUCATION LOTTERY CORPORATION" which was used exclusively for the deposit and holding of lottery ticket sale proceeds and the authorized transfer of funds to and from the Plaintiff via electronic transfer.  The trust res – inclusive of proceeds and unsold tickets – was clearly created at the time the Defendant created the bank account and when he accepted the tickets from the Plaintiff to be held "in trust."  At that moment, under Tennessee law, the Defendant, as trustee, held legal title to the unsold lottery tickets he possessed and the lottery ticket sale proceeds he was to receive, even though equitable title remained in the Plaintiff.  There can be no question that the parties intended to create a trust account into which the Defendant was required to deposit the lottery ticket sale proceeds received and collected by him but belonging to the Plaintiff, and his duty to pay over the proceeds to the Plaintiff arose upon his receipt of the lottery tickets.

Having found the existence of an express trust, the court likewise finds that the parties' relationship satisfies the Sixth Circuit's definition of fiduciary under § 523(a)(4).  As previously discussed, although not defined by the Bankruptcy Code, defalcation includes the "misappropriation

of trust funds or money held in any fiduciary capacity; failure to properly account for such funds."

BLACK'S LAW DICTIONARY 417 (6th ed. 1994).  In this circuit, once the existence of an express or

technical trust has been established and it is proved that the trustee to the proven trust has failed to

properly account for or allocate funds in an objectively reckless manner, the requisite fiduciary

relationship is met.  In this case, it is undisputed that the Defendant did not properly account for

lottery ticket sale proceeds in the amount of $5,104.00 due the Plaintiff.  Because there was an

express trust created under the Retailer Contract, Retailer Application, Tennessee Code Annotated

§ 4-51-120, and the Retailer Rules and Regulations, the Defendant owed a fiduciary duty to the

Plaintiff to pay over all lottery ticket sale proceeds, and his failure to do so constitutes defalcation

for the purposes of § 523(a)(4).  The $5,104.00 owed the Plaintiff by the Defendant in lottery ticket

sale proceeds is nondischargeable.

A judgment consistent with this Memorandum will be entered.

FILED:  June 3, 2010

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

27